Good morning. May it please the court, William Harris on behalf of T.D. Bingham. I'll reserve two minutes to reply. Okay. Well now, so we've got two counsel. So how are you proposing, stop the clock for a second, just how are you proposing to divide your time? I would like to yield one minute to Mr. Rosen on behalf of Heavily. Does Mr. Rosen agree to that? I have your order, yes, thank you. Okay, because that doesn't sound like 50-50. I think I was in addition to 50-50. I think he's giving me 11. Oh, oh, okay. So I'll speak. Put us back at 20, just so that while we're working this out here. I'll take seven plus two for reply and yield a minute to Mr. Rosen. So I'll take nine total. Okay, and so you get 11 and what do you want to, what does Mr. Rosen want to say for rebuttal? I'll say one for rebuttal. Okay, so you're going to talk 10 plus one. Okay. All right, now we're back at 20. We've worked this out, so I appreciate that. Thank you. Go ahead, Mr. Harris. Yes, Your Honor, I'd like to begin by addressing the principal allegation against my client in this case, which was that he sent a letter from Colorado to Pennsylvania that resulted in some murders that occurred in Pennsylvania. And I just wanted to clarify our argument for the court. We assert that there's insufficient evidence to support the liability on counts six and seven under either a Pinkerton theory or an aiding and abetting theory. And I would just go back to the main source of the standard of review, Jackson versus Virginia, and invite the court's attention to page 319 of that opinion where it says upon judicial review, all of the evidence is to be considered in the light most favorable to the prosecution. And the point is that we're making is that upon consideration of all of the evidence, not just cherry-picking part of it. Well, all right, but you're breaking down on whether it was a declaration of war or whether it was a warning, right? Correct. And insufficiency of the evidence that you're saying that it – you know insufficiency of the evidence is a tough rock to push uphill. Yes, Your Honor. So tell us why it's really insufficiency of the evidence and not just a jury argument that you're making again here. It is insufficiency of the evidence. We went through all of the evidence relevant to this particular note. It's an ambiguous message announcing – So the message is the one that said war with D.C. Blacks, T.D. Correct. Correct? That's it. That's what we're talking about. So you need to say that a reasonable jury looking at this note and the other evidence about the Aryan Brotherhood could not interpret that as being a declaration of war. Yes, considering the entirety of the evidence. And that's our argument. The note came – our position is that the entirety of the evidence – It just sounds like a jury argument. You know, it sounds like there's two ways to look at it and they didn't buy your argument. Well, we say there's not two ways to look at it in light of the entirety of the evidence, which includes evidence such as the fact that a war had already been declared by the D.C. Blacks on June 16th when this note was sent two months later, Your Honor. Okay, well, if you're talking the entirety of the evidence, I'm just going to slam you right here. What about the baby boy? Baby boy and a baby girl. Didn't he have a grandchild that was a baby boy? Well, that was something that occurred – a communication that occurred three days after the note in question. The note that we're talking about is whether or not there was a causation on a note sent on August 14. The baby boy, which was the cover text of this other letter, came three days later. So that just can't be considered? It can be considered, but considered in the entirety, our position is that – So what does baby boy mean as opposed to baby girl? Baby boy, according to the evidence, it meant go forward. It meant yes, affirmative, war. But in light of the entirety of the evidence, that was after we were asking the court to consider the fact that the critical piece of evidence on whether or not the war – the killings had a causal connection to this letter sent by my client. The letter was already gone three days before, so this was after the fact. And our position is that a jury, considering all of the evidence, still could only come to the single conclusion that this was the announcement of a war that had already been declared by the D.C. blacks on December – on June 16. And I would refer the court back to the June 16 letter, which is page 456 of the excerpts of record. So you've got a declaration, an explicit declaration of war by the D.C. blacks on June 16, followed by war with D.C. blacks, T.D., which is literally the announcement that a state of war exists. And our position is that that was a warning, and that considering all of the evidence, not just part of it, but considering all of the evidence, no rational juror could come to a conclusion other than the fact that this was the announcement of a war, in effect a warning. And the person who actually delivered the message, Mr. Slocum, as the court, I'm sure, saw from the briefs on the very next day after the Lewisburg killings, he stated exactly what was – he was intercepted on a phone message on a prison call, and he said exactly what the message was. He said they were warned. And so this is – we're just asking the court – I understand that this is a tough row to hoe on this particular standard, but I just wanted to clarify that the inquiry is – the entirety of the record has to be looked at. Okay. I think we have that argument in mind. I think one of the other things that you – another argument that you make is that the leadership restructuring of the Aryan Brotherhood in 1993 essentially started a new conspiracy unrelated to the prior Aryan Brotherhood conspiracy. Yes, Your Honor. What case law supports that? What's your best case on that? It's a factual argument. I mean, it's – the question is whether or not there's Supreme Court cases talking about what constitutes a racketeering enterprise, the most recent Boyle being the Supreme Court. But it's really a factual question on that one, Your Honor, whether or not there was a new conspiracy in light of – this was the crown jewel of the government's case, and the testimony of Mr. Benton said that it was completely restructured and completely different ballgame after the creation of that mission statement. Does it matter, given that the murders of Joyner and Salam happened after 1993? And so to the extent the jury found those two predicate acts, does it really matter if there's a divide between 93 before and after? Well, that goes – no. I mean, that goes to – we're back to count one now, about whether or not there's sufficient evidence on count one, the various racketeering acts. Not for that purpose. I mean, those both fall on one side of the divide. Right. So we have a separate argument going to count one. So you'd have to win on both of those. You'd have to – both that the evidence was insufficient for Joyner and Salam and that you have to consider pre- and post-93 separately. Is that correct? Partially, but also we have pointed out problems with five of the six predicate racketeering acts. So actually the point Your Honor makes is the secondary argument, the primary argument as we went through that five of the six racketeering acts either were not proven or should have been dismissed for due process violations, as set forth in the brief. And I see that I'm running out of time here. All right. Yeah, well, we asked you a question. So I'm going to put it back to 13. So I – you've used your seven. You've used eight, but I'm going to put it that you've only used seven. Thank you, Your Honor. Okay, so I'll give you two minutes on rebuttal and I won't cut into this. I'm sorry, this is a little complicated. Thank you. It's the only way I can keep track. Okay. May it please the Court. Bernard Rosen on behalf of Defendant Hebley. I represent the defendant whose Rule 29 motion was granted in part at the district court level. The court making its finding at page six of its written order that the court finds that the myriad intervening facts between Hebley's message and the Lewisburg murders rendered the murders too remote to be plausibly considered within the natural and probable consequences of Hebley's having sent the message, even drawing every plausible inference in favor of the government. We have real issues, and they start before the grand jury. A panel of this court recently reminded the government that it has a special duty not to impede the truth, that it is improper for the government to present to the jury statements or inferences it knows to be false or has a very strong reason to doubt that's the Reyes case. That was a trial jury where there's a defense representative available to jump up and make objections and a United States district judge to make sure that the rules are applicable. What is the government's burden before the grand jury where neither are present? Are you talking about the government's presentation of Mr. Hebley's message, the get ready message? Is this the argument, your argument? At the grand jury and not telling the jury about the January 2nd attack at Marion. So is it your position that the government had an obligation to present exculpatory information to the grand jury? That's not exculpatory, that's cause and fact. If we take the Ray murder, for instance, Ray was garroted, and it wasn't Mr. Wolf that presented the case to the grand jury. So you can see that they don't have an obligation to disclose substantial exculpatory evidence. Oh, that's clear. U.S.B. Williams. That's clear. This is not exculpatory. If concerning the Ray murder, the assistant U.S. attorney had said to his agent, tell the grand jurors that Ray was stabbed because we found a shank in Hebley's cell. Is that exculpatory, not telling them that he was garroted? Of course not. That's cause and fact, and they've made a false inference. That's what they did here. They told the jury in Overdack 252 that McElhaney and Sahakian ordered white inmates at Marion to murder black inmates in retaliation for assaults on white inmates. The prior Overdack stated that Hebley sent the message to make knives and commit acts of violence against black inmates. This was the district court's finding in its ruling on our Rule 29 motion. On January 2, 1997, a large group of black inmates attacked a smaller group of unarmed white inmates. To avenge this attack, the white inmates at Marion started making war plans. It is undisputed that the racial conflict at USP Marion was well underway when Lee arrived there and delivered Hebley's message. Everybody knows that. The government knew it at the time except the grand jurors. That was cause and fact. That's not the failure to provide exculpatory evidence. In Nova Scotia, in the Bank of Nova Scotia case, the last word of our Supreme Court on this issue, amongst the findings that the district court had made in that case was that false statements had been made to that grand jury. This is what the Supreme Court said on that particular issue. In light of the record, the finding that the prosecutors knew the evidence to be false, or that the government caused the agents to testify falsely is clearly erroneous. So what should the government have said? Was the government's failure to say that Ray was strangled? No, I was using that simply as an exemplar. So what was it that the government should have said? What the government should have told the grand jurors was that prior to McElhaney and Sahakian issuing its order in Overdack 252, that there was the attack by the black inmates on white inmates at Marion. That's what caused the war. So is that your view of the government's erroneous or outrageous conduct before the grand jury  The district court found that it was undisputed that the message arrived after the plans at Marion were already underway. The testimony established not only were the plans underway and the hit list being created, chants were already being created, and Mr. Lee was still in transport. Well, let me ask you this. In terms of at the trial, all of that came in, right? Yes. And they still convicted Mr. Hadley, right? And that led in part to the granting of the Rule 29 motion in part. The court finding that his actions were not the natural, that the murders were not the natural and foreseeable consequences of anything he did. Natural and foreseeable consequence, by the way, is an element of the conspiracy theory, not aiding and abetting. But the district court ruled that it was only going to stop the government proceeding on aiding and abetting. Well, aiding and abetting as opposed to the Pinkerton, correct? Two cases of this circuit using slightly different reasoning, Garcia and Castaneda, both say there are limits on the use of guilt by association to permit a finding of guilt. And given the court's findings. I was looking at Castaneda, where it's the wife, right, who was just taking some phone calls. And then we have Chong, on the other hand, where there's a definite structure, where there are orders being given and associates doing things in furtherance of the conspiracy, explain why this case and Heavily's message, as I guess he was a fairly high officer in the organization, in the enterprise, why it's more like Castaneda, which was just the wife, as opposed to the Chong case. Castaneda is answering some phone calls, but the panel of this court said that wouldn't be enough. In Chong, Chong is actually talking about murdering the particular defendant or the particular victim that gets murdered. Al Benton, a government witness, testified that my client was out of the loop. He was a thousand miles away from where the murders occurred. The most significant testimony on that may be Miss Adams. Miss Adams was the BOP official who testified for three or four days about the messages that she was monitoring going in and out of ADX. The mail, the phone calls, in and out. Three or four days of testimony, at least two on direct, not a message in or out to Heavily. He's out of the loop. So he may be out of the loop for this particular event, but the district court's Pinkerton, in discussing Pinkerton, indicated that while he was part of the AB enterprise, the Aryan Brotherhood enterprise, understood that there was this tension or this war, that's enough. Why is that not enough? Because the panel of this court has said under Garcia that that's not enough. Well, Garcia was just random gang violence. I mean, there wasn't any enterprise there. Mr. Garcia is present at the shooting, waving his colors out the window. Waving colors out the window is a very definite act that's going to cause a response. But a panel of this court said that's not enough to show that he was there and a natural and foreseeable consequence would be the shooting that ended up as an assault. My client is out of the loop. None of his messages have anything to do with anything, and it's all a conspiracy theory. The government remained silent while we tried to put in the indictment from Illinois. The Sahakian indictment? The Sahakian indictment. The district court said it was surprised. It ordered me to file a memorandum showing that it was admissible, and we cited U.S. v. Qatar. It invited the government to respond, and the government didn't. Only now, after the fact, is the government trying to defend that. Well, no, but the government doesn't have to take the same position at both. I mean, we're reviewing it for – it was a 403 issue, right? That's correct. And so we're reviewing it for abuse of discretion, and the district court said, while it might have had some relevance, they weren't going to spin it. It would have distracted the jury. It would have been a whole other trial. The trial was going on. That was in the middle of Dewey Lee, who was testifying about what went on at Marion, then followed by Walker, who testified about what went on at Marion, followed by Van Meter, who was testifying about what went on at Marion. The whole Marion is so much involved in this case, it was all coming in anyway. Well, your reason for – you wanted to introduce the indictment of other A.B. members to show that he was not prosecuted for crimes at Marion, right? That it was the government's theory at Marion that he was not conspiratorially responsible. That's a different government theory. The United States of America is the United States of America, whichever district they're in. That's what Katar said. Okay. You've used your time, and so you have two minutes for rebuttal, and Mr. Bingham has one minute for rebuttal. Thank you. Unless Judge Acuda has any additional questions. Good morning. Good morning. I'm Stephen Wolf for the government in four of these appeals. Your Honor, taking the observations of the two defendants in this case in order, the biggest flaw in Mr. Bingham's argument is the one your Honor pointed out, that this is a jury argument, and the answer that Jackson says all the evidence should be looked at isn't the answer either, because Jackson also says that inferences have to be drawn in favor of the verdict, and credibility assessments have to be drawn in favor of the verdict. The assertion that essentially as a matter of law it has to be a warning rather than a war call flies in the face of credibility assessment and inference. Al Benton said. Well, a response to an insufficiency of the evidence. Tell us what evidence that there was that the inferences could be made. I mean, he, you know, I think we're in agreement at the standard of review and it has to be the totality of the evidence and all inferences go in favor of the jury verdict. He didn't, you know, Mr. Bingham's counsel did not dispute that. So what is that evidence that you hang your hat on here? It's of two different kinds. Some of it is context. One of the hardest things in thinking about this case is to avoid piecemeal analysis, which Mr. Harris accused the government of. The trial went on for five months, and some of the things that are said are about. It's not hard. Tell me what your evidence is. That's what lawyers make closing arguments all the time. So tell me what are the facts that say that they're, you know, what's the evidence, that it's not insufficiency of the evidence? The direct evidence is primarily the message itself. Chris Risk, who passed the message from Barry Mills to Bingham, the message is characterized as pacific by Mr. Bingham, but the message said, it's an excerpt of record, page 458, the war is on. There's nothing pacific about that. Al Benton said in his testimony, it's quoted at our opening brief at pages 54 and 55, the message was war, kill every black you can find. That was Benton's interpretation of the message he got from Bingham? Is that what you're saying? Yes. He said that when he read the message, war with D.C.T.D., that he understood from his years on the commission of the Aryan Brotherhood and his years in the A.B., that that's what it meant. He was asked on redirect naturally, is there any doubt in your mind about whether it was a war call rather than a warning? He said, no, there's no doubt. What was it? It was a war message. And that brings us back.  The other thing in gang situations is there is a distinction between the predators and the prey, and that the A.B. took pride in their reputation internally and externally, that they were the predators among white inmates in the federal and California prison systems. And this also relates to Mr. Rosen's argument about Dewey Lee's message. When Dewey Lee says, get ready means start making knives and organize the whites, that can't mean anything but kill first. Well, I took his argument for Mr. Heavily that the government failed to inform the grand jury that the war was already ongoing at the time the message was received. Your Honor, that's just not so. The real argument for Mr. Heavily is that the indictment didn't inform the grand jury. It's undisputed that the trial jury heard again and again about the sequence of events. Moreover, the grand jury heard it as well in testimony from the witnesses who testified, because there was a great deal of testimony about it. But Mr. Heavily's argument is that the indictment, because it doesn't describe anything except overt acts, that is, it doesn't say what the D.C. blacks did, it says Mike Wagner attacked Butch Johnson in December of 1996 in retaliation, and it describes what the conspirators do, not the other events. But the grand jury heard it many times. They heard it from Wagner and Van Meter. I don't believe Dewey Lee testified in the grand jury. But the complaint is about the indictment, not the testimony itself. All right, when we're talking about the note, what is the significance from the government's position about the baby boy, baby girl? Just as Your Honor pointed out, baby boy, they say in the early summer, we're waiting to see, and then the sequence unspools. The message goes out saying it is a baby boy. That's the open, the cover letter message. It was the decoded, biliteral cipher message underneath the cover message. It was what Chris Risk quoted the message as, that he hidden the mop handle that reached T.D. Bingham. It's what Gene Bentley said. Gene Bentley said that Mr. Bingham said it was war in his trial testimony. Bentley also said that when we sent the message to Lewisburg, we also began preparing for war at the ADX. They wrote a message in a biography of Napoleon in a library book that would be taken out by Kevin Roach, who was in a different unit, so that he would kill B.D. Hinnant, a D.C. black who was in his unit, so that Bentley described not just the message for war and that that's what it was, but the steps that were taken at the ADX. I don't have, I'm sorry to say, the Napoleon Code exhibit number, but it was an exhibit at the trial, so that the war was, it was war in the message that Risk carried to Bingham. It was war in the message that Bingham sent out. It was war in the steps taken at Bingham's location by Bingham and Bentley. I believe those are the particular points. The other matter that counsel addressed is the restructuring, and the point is made about the government's evidence about that really essentially is the document itself. If the document's read, it's in the appellant's excerpts of record at 399 and 400. It shows that there was a restructuring. Membership was the same. The purposes were the same. The rules were the same, and Mr. Bingham adverts to Boyle on the question of structuring. The government relies on Boyle as well. It's at page 2245 through 2246. As we said in Turquette, an association, in fact, enterprise, is simply a continuing unit that functions with a common purpose. Such a group need not have a hierarchical structure or a chain of command. Decisions may be made on an ad hoc basis and by any number of methods, by majority vote, consensus, a show of strength, et cetera. Members of the group need not have fixed roles. Different members may perform different roles at different times. I submit, Your Honors, that Boyle is essentially describing the AV. The membership is the same. The purposes are the same. The roles change. They had more ad hoc decision-making prior to 1993, and it was more organized after 1993. The Heavley message, Mr. Heavley suggests, Your Honors, that because the district court granted the Rule 29 motion as the aiding and abetting theory, it somehow undercuts it as to the conspiracy liability. I suggest to the contrary. The court found that the interpretation given to the grand jury, that when Dewey Lee said, get ready, he meant start making knives and organize the whites, was reasonable. He wasn't at the Lewisburg, right, at the time that he had been transferred already? He was sort of out of the loop, as they argue? Yes. He was at Lewisburg, and then he moved away some months before the murder. I come back to the point made. Well, he didn't really move on his own, I don't think. No, Your Honor. He was transferred by the Bureau of Prisons. It's not like he made a voluntary move. So he's at Lewisburg. He gives the message to people at Marion, right? Yes, Your Honor. And then before anything happens at Lewisburg, he's transferred. Yes, he's sent to the ADX in Colorado. To ADX. So he is sort of out of the loop. And opposing counsel says, well, this is more like the Garcia case than it's like the Chong case. And even though he was part of this gang, the war that's happening over at Lewisburg, he's out of it. So Pinkerton liability doesn't work. So how do you address that? In two ways. One is the out of the loop testimony was from Al Benton, and it was peculiar to the situation at Lewisburg. He said, we were out in a block where the murders took place, and Heavily was in the hole at Lewisburg. Because he was in the hole, and communication between the secure special housing, the hole as it is, and the open yard is difficult. Heavily was out of the loop at Lewisburg. The evidence on Heavily's role in the conspiracy is that he had been a member for more than 20 years. This isn't the first conviction he sustained for conspiracy to murder on behalf of the AB. That was the conviction in 1980 that converted his bank robbery sentence from seven years into what amounted to the rest of his life. He was in the AB for years and years. He was a former member of the commission. He plainly thought that he was important enough to pass messages to the AB. Al Benton plainly thought that he was the big guy and that Mr. Heavily should not be sending messages. That's part of what Benton meant when he said the defendant was out of the loop. So you're saying it's not a reasonable interpretation that he was out of the AB or not involved in the conspiracy, but he was in the hole? That he was in the hole meant, I believe, exactly what Mr. Benton said, that he had poor communication between the yard at Lewisburg and... Because when you're in the hole, you're, what, in there 23 hours a day, and then they let you out by yourself an hour a day, maybe, or something like that? Yes, more or less. His membership in the conspiracy was the Aryan Brotherhood racketeering conspiracy, which his membership began 17 years or more before the murders and continued for years and years after them. And there's no assertion that there was any instructional error about this. So, well, let me ask you this. Aiding and abetting is a different theory than Pinkerton, correct? Yes, Your Honor. And so do you agree that there was insufficient evidence for the aiding and abetting, as it turned out, but there's sufficient for the Pinkerton? I agree that Judge Carter's conclusion is a reasonable one. I'm not sure that I would make it, but I don't, no, I don't disagree. So why is aiding and abetting harder to prove in these situations than Pinkerton? Because aiding and abetting focuses, as Mr. Rosen says, essentially on cause and effect. It requires... Having access? Well, you aid, abet, counsel, command, or procure, whereas the Pinkerton theory is a conspiracy-based liability. If you're a member of the conspiracy, another member kills in furtherance of the conspiracy, I don't believe it's even an element that you know that it's going to happen. So the rest of that, if you buy into the fact of what the purpose of the A.B. is, what the rules are, and that everyone allegedly knows what the rules are, and when people go in the hat, and when things are ordered, then that, it's foreseeable that even though you may not be at a location where they're killing someone, that you're tied into that act. Yes, sir. It's foreseeable to Mr. Heavily, just as it was to Mr. Benton, that at any time the A.B. members elsewhere, because it's a national gang, and they strive for national control of the most serious, the maximum security penitentiaries, it's foreseeable that you may engage in gang warfare between gangs, and that the word may come that it jumped off somewhere else, and you're obliged to follow up at Lewisburg or at the ADX. So how do you distinguish Garcia? Because in Garcia we said, look, just because you're a member of the gang, doesn't mean that you can be held liable for every random murder that other members of the gang do in their gang warfare. Your Honor, I think the distinction is in two parts, really. This gang, the A.B., is considerably different from the average street gang about which Garcia dealt. It has existed far longer, it's smaller, it's more tightly coupled, and the defendant's role in it was very significant. As I said, he was one of the three national commissioners of the federal faction for a number of years until he was removed. He also was aware, because of his lengthy membership and the fact that he always wound up, because of his prior conspiracy to murder convictions, he always finds himself in the penitentiary system at the most secure institutions. He knew about prior wars, a prior war, between the A.B. and the D.C. blacks in the 1980s. Well, tell me factually, are you distinguishing factually the evidence that was put on in this trial and the structure of the A.B. and, you know, there was a lot of testimony about that. Is that what factually distinguishes you from Garcia, or is there something else? Well, it's fundamentally a factual distinction, but the factual distinction has some legal implications, too. That is that membership means something more for Mr. Heavily than it did for the defendant in that case. The gang itself is something more than the gang was in that case, and foreseeability in the context of the type of membership that Heavily had and the type of gang that is involved, foreseeability definitely means something else to the A.B. than it did to the gang in Garcia. All right. Your Honor, the Sahakian indictment, I'd say one thing about that. The difficulty is not that events at Marion weren't put on. A trial was put on about that, and it was every bit as extensive as Mr. Heavily makes out. What wasn't put on was what was the thinking of the government in not charging Mr. Heavily. After all, the Sahakian indictment is in the Central District of Illinois. It's not a racketeering indictment. It's a murder indictment, and the question is, what does it mean not to charge someone? Does it mean that it's inconvenient? Does it mean that the Central District of Illinois is small and doesn't take on five or six defendants in a death case if they can do it alone? I see where the court's coming from, and having been a trial judge, I see where the court doesn't want to spin off in a whole other thing, but what I heard appellant's counsel say was that you didn't oppose it there, and now you're defending the judge here. Your Honor, what defendant says is that their record doesn't show the government objecting at the time, but this issue had come up more than once before. Chris Gibson, a defendant who was at trial and hasn't appealed, was found guilty of an assault and got six months at the ADX in Colorado in the late 90s for something that the government charged as an attempted murder, and other defendants tried to use in litigation before Judge Carter, tried to use the fact that the government allowed Gibson to plead to an assault to assert that the other defendants who took part, therefore, couldn't have had the specific intent involved for attempted murder. So my point is that Judge Carter had heard a lot of litigation about what do indictments and prosecutorial decisions elsewhere mean by way of positive assertions about the government's mental state in charge, and he was on top of this issue. He often ruled on objections just when I stood up, for instance, or when another member that we stood up to object, we didn't always have a chance to get it out. I'm not saying that happened here because I have no recollection, but I'm saying that the government believed it was improper then, and so did Judge Carter. All right, do you have any additional questions? Your time's almost up. If you want to use your 29 seconds, you can. Otherwise, we don't have any additional questions. Nothing further, Your Honor. Thank you. All right, I think Mr. Harris, you have two minutes. Yes, Your Honor. Just briefly, when the court is evaluating from the record the import of this message, War with D.C. Blacks, I would just ask the court to focus on the sequence here of the evidence in the record. June 16 of 1997, and it appears that excerpts of record 456, there is a declaration in evidence by Butch Johnson at the ADX, the D.C. Blacks leader, that I'm at war and you will hear about it because when I see them, it's on June 16th. The message from Mr. Bingham then comes August 14 of 2007, about two months later, War with D.C. Blacks. He's saying the same thing about this war that has been previously declared. And then the third piece of the sequence appears at 444 to 445 of the excerpts. August 29, the date right after these killings, the next morning, the person who conveyed the message to Pennsylvania, to Lewisburg, Mr. Slocum, is interviewed and he's told about what happened in Lewisburg. And he states, this is the guy that delivered the message, well, they were warned. That's how he characterizes, that's how the messenger characterizes the message the day after the killings when he first hears about it. So our argument is that taking that sequence of events, and in light of the totality of the evidence, and in light of the literal ambiguity of War with D.C. Blacks, that no rational juror could conclude otherwise, that this was a warning. Factually, that's what flows from the totality of the evidence. With that, I'll submit it. Thank you. Very quickly, Your Honors, concerning the Sahakian indictment, Mr. Wolf did not start to stand up. Four U.S. attorneys were sitting at the table when the government invited them to file an opposition. None of them did, and what Mr. Wolf does also forget is that I had advised the district court in one of the pleadings, after the fact, I confess, that I had told Mr. Wolf in advance I was going to offer the indictment. So he knew Qatar, which is the basis for this decision, involved statements in sentencing memoranda in other districts and a statement in a civil pleading. So certainly this indictment had relevant information that was already going on. Concerning what the grand jury was told as opposed to the indictment, the district court rendered the extraordinary order of having the transcripts submitted to him in Cameron on those overt act issues and then ordered two pages of the transcript published. The minute order is in volume one of the excerpts of records. It was docket item 3148. The two pages of the transcript are in volume three. Al Benton said he had been out of the loop for quite some time, not because he was simply locked up in Lewisburg, and the Adams testimony exemplified that perfectly. Thank you for your argument. Thank you both for your argument. This matter will stand submitted.
judges: Rymer, Callahan, Ikuta